# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### (CENTRAL DIVISION)

| | | |
|---|---|---|
| JAMES ("JIM") NEWTON, II, an individual; and BRENT MESKIMEN, an individual, | ) ) ) | Case No. _:__-cv-___ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| PAUL SWINTON, an individual; RONALD ("RON") MEAD, JR., an individual; DANIEL ("DAN") PITCHER, an individual; ANTHONY ("TONY") KIMMI, an individual; MARK WICKHAM,) an individual; KARL OLSON, an individual; KAREN RIECK, an individual; WICKHAM & GEADELMANN, P.L.L.C., an Iowa professional limited liability company; FBL FINANCIAL GROUP, INC. (d/b/a FBL FINANCIAL GROUP and FARM BUREAU FINANCIAL SERVICES)) a corporation; and FARM BUREAU PROPERTY & CASUALTY INSURANCE COMPANY (formerly d/b/a IOWA FARM MUTUAL INSURANCE COMPANY and FARM BUREAU MUTUAL INSURANCE COMPANY), a corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT AND JURY DEMAND** |
| Defendants. | ) ) ) | |

COME NOW Plaintiffs James ("Jim") Newton, II, and Brent Meskimen, by and through their attorneys, Stuart L. Higgins of Higgins Law Firm, P.L.L.C., and Justin K. Swaim of Swaim Law Firm, P.L.L.C., and for their causes of action against the above-named Defendants, Paul Swinton, Ronald ("Ron") Mead, Jr., Daniel ("Dan") Pitcher, Anthony ("Tony") Kimmi, Mark Wickham, Karl Olson, Karen Rieck, Wickham & Geadelmann, P.L.L.C., FBL Financial Group,

Inc. (d/b/a FBL Financial Group and Farm Bureau Financial Services) and Farm Bureau Property & Casualty Insurance Company (formerly d/b/a Iowa Farm Mutual Insurance Company and Farm Bureau Mutual Insurance Company), and in support of their Complaint and Jury Demand, respectfully state as follows:

## PARTIES

1.      Plaintiff James ("Jim") Newton, II, ("Newton") is an individual and was at material times hereto a resident of the State of Nebraska and now resides in the State of Nevada. At all times material hereto, Newton was employed by FBL Financial Group, Inc. (d/b/a FBL Financial Group and Farm Bureau Financial Services) ("FBL" or "FBFS") and/or Farm Bureau Property & Casualty Insurance Company ("FBPCIC") and/or other Farm Bureau-affiliated or otherwise related companies (collectively "Farm Bureau").  Newton was initially hired as a Special Investigator for FBL/FBFS.  Throughout his remaining employment, Newton subsequently served as Team Lead, Special Investigations Unit ("SIU") Manager, SIU Internal Manager, and then ultimately promoted to the position of Director of Investigations for FBL/FBFS.

2.      Plaintiff Brent Meskimen ("Meskimen") is an individual and was at all material times hereto and is a resident of the State of Iowa.  At all times material hereto, Meskimen was employed by FBL Financial Group, Inc. (d/b/a FBL Financial Group and Farm Bureau Financial Services) ("FBL" or "FBFS") and/or Farm Bureau Property & Casualty Insurance Company ("FBPCIC") and/or other Farm Bureau-affiliated or otherwise related companies (collectively "Farm Bureau").  Meskimen was initially hired as a Special Investigator II for FBL/FBFS, and then ultimately promoted to Special Investigations Unit ("SIU") Manager for FBL/FBFS.

3.      Defendant Paul Swinton ("Swinton") is an individual and was at all material times hereto and is a resident of the State of Iowa.  At all times material hereto, Swinton was and is an attorney practicing law with, a member of, and/or employed by Wickham & Geadelmann, P.L.L.C. ("WG") (either under the law firm's current name or one or more of its former names).  In addition, at all times material hereto, Swinton has served as Senior Counsel for the Iowa Farm Bureau Federation and affiliated companies.  At material times hereto, Swinton held the position of Assistant General Counsel (and/or Assistant General Counsel—Property Casualty) at FBL/FBFS and/or FBPCIC and/or Farm Bureau.

4.      Defendant Ronald ("Ron") Mead, Jr. ("Mead") is an individual and was at material times hereto formerly a resident of the State of Nebraska and was subsequently at other material times hereto and is now a resident of the State of Iowa.  At all times material hereto, Mead was and is employed by FBL/FBFS and/or FBPCIC and/or Farm Bureau.  At material times hereto, Mead served as the Vice President—Personal Lines & Agriculture of FBL/FBFS, then the Vice President—Sales & Distribution of FBL/FBFS and/or FBPCIC, and then the Chief Operating Officer—Property Casualty of FBL/FBFS and/or FBPCIC.  At material times hereto, Mead also served as a registered representative of FBL Marketing Services, LLC.

5.      Defendant Daniel ("Dan") Pitcher ("Pitcher") is an individual and was at all material times hereto and is a resident of the State of Iowa.  At all times material hereto, Pitcher was and is employed by FBL/FBFS and/or FBPCIC and/or Farm Bureau.  At material times hereto, Pitcher served as Chief Operating Officer—Property Casualty Companies of FBL/FBFS and/or FBPCIC, and then the Chief Executive Officer of FBL/FBFS and/or FBPCIC.  At material times hereto, Pitcher also served as a Class A Director on the Board of Directors for FBL/FBFS.

6.     Defendant Anthony ("Tony") Kimmi ("Kimmi") is an individual and was at all material times hereto and is a resident of the State of Iowa.  At times material hereto, Kimmi was and is employed by FBL/FBFS and/or FBPCIC and/or Farm Bureau.  At material times hereto, Kimmi served as Vice President—Property Casualty Claims of FBL/FBFS and/or FBPCIC.

7.     Defendant Mark Wickham ("Wickham") is an individual and was at all material times hereto and is a resident of the State of Iowa.  At all times material hereto, Wickham was and is an attorney practicing law with, a member of, and/or employed by Wickham & Geadelmann, P.L.L.C. ("WG") (either under the law firm's current name or one or more of its former names).  In addition, at times material hereto, Wickham served as General Counsel for the Iowa Farm Bureau Federation and affiliated companies.  At material times hereto, Wickham held the position of General Counsel at FBL/FBFS and/or FBPCIC and/or Farm Bureau.  At material times hereto, Wickham was also an Officer (Secretary) and Director of Farm Bureau Management Corporation ("FBMC").

8.     Defendant Karl Olson ("Olson") is an individual and was at all material times hereto and is a resident of the State of Iowa.  At times material hereto, Olson was an attorney practicing law with, a member of, and/or employed by Wickham & Geadelmann, P.L.L.C. ("WG") (either under the law firm's current name or one or more of its former names).  In addition, at times material hereto, Olson served as Vice President & Assistant General Counsel (Litigation) at FBL/FBFS and/or FBPCIC and/or Farm Bureau.

9.     Defendant Karen Rieck ("Rieck") is an individual and was at all material times hereto and is a resident of the State of Iowa.  At times material hereto, Rieck was and is employed by FBL/FBFS and/or FBPCIC and/or Farm Bureau.  At material times hereto, Rieck served as Vice President—Human Resources of FBL/FBFS and/or FBPCIC.

10.     Defendant Wickham & Geadelmann, P.L.L.C. ("WG") was at all material times hereto and is an Iowa law firm and professional limited liability company with its registered office and principal place of business at 5400 University Avenue, West Des Moines, Iowa 50266 (either under the law firm's current name or one or more of its former names).

11.     Defendant WG lists on its website the following as the law firm's clients:  Iowa Farm Bureau Federation, FBL Financial Group, Inc., FBL Leasing Services, Inc., FBL Insurance Brokerage, LLC, Farm Bureau Life Insurance Company, Farm Bureau Mutual Holding Company, Farm Bureau Multi-States Services, Inc., Farm Bureau Property & Casualty Insurance Company, Greenfields Life Insurance Company, Western Agricultural Insurance Company, Agriland FS, Inc., Three Rivers FS Company, FBL Marketing Services, LLC, and FBL Assigned Benefit Company.

12.     Defendant WG is liable for all the acts of its attorneys, employees, members, officers, and agents under the doctrine of respondeat superior because (among other things): (a) WG benefited from its employees' illegal conduct; (b) the conduct occurred substantially within the time and space limits authorized by employment; (c) the employees were motivated (wholly or in part) by a purpose to serve WG; and (d) the conduct was of a kind that the employee(s) was hired to perform.  The actions of WG's attorneys, employees, members, officers, and agents were otherwise within the scope of their employment.  In the alternative, WG ratified or affirmed the illegal actions of its employees, which caused injury to Plaintiffs.

13.     FBL Financial Group, Inc. (d/b/a FBL Financial Group and Farm Bureau Financial Services) ("FBL" or "FBFS") was at all material times hereto and is an Iowa for-profit corporation, duly organized and authorized to do business in the State of Iowa, with its registered

office and principal place of business at 5400 University Avenue, West Des Moines, Iowa 50266.

14.    Farm Bureau Property & Casualty Insurance Company (formerly d/b/a Iowa Farm Mutual Insurance Company and Farm Bureau Mutual Insurance Company) ("FBPCIC") was at all material times hereto and is a duly organized and licensed insurance corporation doing business in the State of Iowa, with its registered office and principal place of business at 5400 University Avenue, West Des Moines, Iowa 50266.

## **NON-PARTIES**

15.    Farm Bureau Management Corporation ("FBMC") was at all material times hereto and is an Iowa for-profit corporation, duly organized and authorized to do business in the State of Iowa, with its registered office and principal place of business at 5400 University Avenue, West Des Moines, Iowa 50266.

16.    Farm Bureau Multi-State Services, Inc. ("FBMSSI") was at all material times hereto and is an Iowa for-profit corporation, duly organized and authorized to do business in the State of Iowa, with its registered office and principal place of business at 5400 University Avenue, West Des Moines, Iowa 50266.

17.    Farm Bureau Mutual Holding Company ("FBMHC") was at all material times hereto and is an Iowa insurance holding company, duly organized and authorized to do business in the State of Iowa, with its registered office and principal place of business at 5400 University Avenue, West Des Moines, Iowa 50266.

18.    Iowa Farm Bureau Federation (d/b/a Iowa Farm Bureau) ("IFBF") was at all material times hereto and is an Iowa non-profit corporation, duly organized and authorized to do

business in the State of Iowa, with its registered office and principal place of business at 5400

University Avenue, West Des Moines, Iowa 50266.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 18

U.S.C. §1964(c).

20.     Venue is proper and appropriate in this Court pursuant to 28 U.S.C. §1391, since

the Defendants are all residents of the State of Iowa, at least some of which are residents of this

judicial district, and a substantial part of the events or omissions giving rise to the claims

occurred in this judicial district—the Southern District of Iowa.  In addition, venue is proper and

appropriate in this Court pursuant to 18 U.S.C. §1965.

21.     Plaintiffs invoke ancillary and supplemental jurisdiction over Plaintiffs' state law

claims pursuant to 28 U.S.C. §1367.

## FACTS COMMON TO ALL COUNTS

**The History and Evolution of the Corporate Structure and Operations of Farm Bureau Property & Casualty Insurance Company and Its Parent Mutual Holding Company and the Relationship of the Insurance Company to FBL Financial Group, Inc.**

*Introduction*

This section provides an overview of the development and changes in the corporate

structure and operations of Farm Bureau Property & Casualty Insurance Company ("FBPCIC" or

"Insurance Company"), along with its parent mutual holding company, Farm Bureau Mutual

Holding Company ("FBMHC" or "Holding Company") and the relationship of the Insurance

Company to FBL Financial Group, Inc.

*Incorporation and Early Beginnings of the Mutual Insurance Company*

22.     Farm Bureau Property & Casualty Insurance Company ("FBPCIC" or "Insurance Company") began as a mutual assessment association in Iowa on February 23, 1939.

23.     This marked the initial step in the formation of the Insurance Company. Incorporated as a mutual company, the organization offered automobile insurance to members of the Iowa Farm Bureau Federation ("IFBF"), a non-profit corporation in Iowa.

24.     The Insurance Company officially began its operations on May 10, 1939.

25.     At the outset, it was known as the "Iowa Farm Bureau Mutual Insurance Company".

26.     In 1943, the Insurance Company expanded its insurance offerings to include general liability insurance in Iowa.

27.     In 1953, the Insurance Company started writing multiple other lines of insurance in the State.

28.     In 1958, the Insurance Company added hail insurance to its offerings in Iowa by becoming the successor company in a merger with "Iowa Mutual Hail Insurance Company".

29.     At the time of the merger, the Insurance Company changed its name to "Farm Bureau Mutual Insurance Company".

30.     Thereafter, the Insurance Company expanded its operations beyond Iowa by mergers with mutual insurance companies in other states.

31.     In 1999, the Insurance Company began offering insurance in South Dakota by merging with and being the survivor company in a merger with South Dakota Farm Mutual Insurance Company.

32.     In 2002, the Insurance Company began offering insurance in certain western states in the United States by merging with and being the survivor company in a merger with Western Farm Mutual Insurance Company.

33.     Also in 2002, the Insurance Company began offering insurance in Utah by acquiring the Utah Farm Bureau Insurance Company as a wholly owned subsidiary, then dissolving the subsidiary, and absorbing its insurance business into the Insurance Company.

34.     In 2003, the Insurance Company began offering insurance in Nebraska by merging and being the survivor company in a merger with Farm Mutual Insurance Company, Inc., and Farm Bureau Insurance Company of Nebraska.

35.     In 2006, the Insurance Company purchased Crop 1 Insurance Direct, Inc., a managing general agency allowing the Insurance Company to offer Federal Multi-Peril Insurance.

36.     The Insurance Company's charter as a mutual insurance company was a public franchise.

37.     The stockholders, and in the case of a mutual insurance company such as the Insurance Company, the policyholders, own the franchise and the Insurance Company itself.

*Reorganization of the Mutual Insurance Company by Formation of a Mutual Insurance Holding Company Based on a Mutual Plan and Continuing the Corporate Existence of the Reorganized Insurance Company as a Stock Insurance Company*

38.     In 2010, the Insurance Company requested, and was allowed by the Iowa Insurance Commissioner, to reorganize based on a Mutual Plan pursuant to Iowa Code section 521A.14, to form a mutual insurance holding company, Farm Bureau Mutual Holding Company ("FBMHC" or "Holding Company"), and to continue the corporate existence of the Insurance

Company, Farm Bureau Property & Casualty Insurance Company ("FBPCIC" or "Insurance Company"), as a stock insurance company.

39.     Pursuant to the Mutual Plan and Iowa Code section 521A.14, the membership interests of the policyholders in the Insurance Company reorganized as a stock corporation, FBPCIC, became membership interests in the mutual insurance holding company, FBMHC.

40.     Every individual, partnership, public or private corporation, board or association, trustee, administrator, executor, or other legal entity, to whom a policy or contract of insurance had been, or was thereafter, issued by FBPCIC, became a member of the Holding Company, FBMHC, and remain entitled to the rights and privileges of such membership, so long as the policy or contract of insurance remained or remains in force and effect.

41.     Pursuant to Iowa Code section 521A.14, and as a part of the reorganization, FBMHC formed an intermediate holding company, Farm Bureau Multi-State Services, Inc. ("FBMSSI"), a wholly 100% owned subsidiary of FBMHC.

42.     At all times material to this action, FBMHC, either directly or indirectly, through its wholly 100% owned intermediate holding company subsidiary, FBMSSI, owned all the voting shares of the capital stock of the reorganized stock insurance company, FBPCIC.

43.     Accordingly, the policyholders of the Insurance Company became and continue to be the 100% owners of the mutual insurance holding company franchise, FBMHC itself, the franchise of the intermediate holding company, FBMSSI, and FBMSSI itself.

44.     As such, the policyholders of the Insurance Company, FBPCIC, are the 100% beneficial owners of FBMHC, FBMSSI, and FBPCIC.

45.     The allowance of fraudulent claims by FBL/FBFS, and the loss experience assessed to the Insurance Company as a result of the allowance of those fraudulent claims,

materially and directly results in financial losses to the policyholders as the beneficial 100% owners of FBMHC, FBMSSI, and FBPCIC.

46.     As a result of this reorganization as a mutual holding insurance company, the Iowa Insurance Commissioner retains jurisdiction over FBMHC, to assure the policyholders' interests are protected, and has the same jurisdiction over the subsidiary intermediate holding company, FBMSSI, as if it were a mutual insurance holding company.  *See* Iowa Code sections 524.14(1)(a) and (7)(b).

> *The Reorganized Stock Insurance Company, FBPCIC, Which Was Converted from a Mutual Insurance Company into a Stock Company as a Result of the Formation of the Mutual Holding Company System in 2010, Purchased a Minority Ownership Interest in the For-Profit Holding Company, FBL Financial Group, Inc. ("FBL"), in 2021*

47.     Following the reorganized FBPCIC's conversion from a mutual insurance company to a stock insurance company as a result of the formation of the mutual holding company system in 2010, the new stock insurance company purchased a minority ownership interest in the for-profit holding company, FBL Financial Group, Inc. ("FBL"), in 2021.

48.     At all times material to this action, FBL has been a holding company operating under the trade name, Farm Bureau Financial Services ("FBFS").

49.     At all times material to this action, FBL and its affiliates have offered a broad range of life insurance, annuity, and investment products sold by its multiline exclusive Farm Bureau agents.  FBL also offers wealth management and financial planning services.

50.     At all times material to this action, FBL has also managed for a fee all aspects of FBPCIC and all aspects of FBPCIC's wholly 100% owned subsidiary property and casualty insurance company, Western Agricultural Insurance Company ("WAIC").

51.     At all times material to this action, FBL has also managed for a fee all aspects of the holding companies, FBMHC and FBMSSI—the parent and intermediate holding companies of FBPCIC, respectively.

52.     At all times material to this action, FBPCIC has entered into a Management Service Agreement with FBL.  The agreement provides general business administration and management services to FBPCIC for a fee.  The amount is fixed annually.

53.     Also, Farm Bureau Management Corporation ("FBMC"), a wholly owned subsidiary of the Iowa Farm Bureau Federation ("IFBF"), provides certain services to FBPCIC under a separate agreement with FBL.  This agreement automatically renews each year on July 1st, unless canceled by either FBPCIC or FBMC.

54.     These management agreements require FBL to provide management services, including but not limited to personnel management, risk management, data processing, regulation and licensing compliance, underwriting, claims processing, legal services, actuarial services, policyholder relations, marketing, investment, financial and accounting services, to FBPCIC.

55.     FBPCIC also entered into an Investment Advisory Services Contract with FBL Financial Services, Inc., a subsidiary of FBL Financial Group, Inc. ("FBL"), for FBL to provide investment research and advice; management of the investment and reinvestment of securities, bonds and like instruments; and accounting services to FBPCIC.  As of January 1, 2022, FBL Financial Services, Inc. was dissolved, and investment expenses are allocated directly as provided to FBPCIC under the management agreement with FBL Financial Group, Inc ("FBL").

56.     In 1996, IFBF took the stock of FBL public, selling shares on the New York Stock Exchange.

57.    In 2021, FBPCIC, the reorganized mutual insurance company that continued its corporate existence as a stock company following the mutual insurance company reorganization, acquired approximately 39.5% of the common stock of FBL.

58.    On May 25, 2021, FBPCIC announced it had completed its transaction with FBL (NYSE: FFG) and acquired all the outstanding shares of the common stock of FBL that were not already owned by IFBF or FBPCIC.

59.    As a part of the announcement on May 25, 2021, FBPCIC stated it and its subsidiary insurance company served in excess of 360,000 Farm Bureau clients/members in eight Midwest and Western states through a network of over 900 exclusive multi-line agents and agency managers, offering a full line of personal and commercial property-casualty insurance products.

60.    As a result of the closing, FBL common stock was no longer traded on the New York Stock Exchange as of May 26, 2021.  IFBF continued and remains as the majority shareholder of FBL, and FBPCIC became and remains the only other shareholder of FBL.

61.    IFBF still owns 60.5% of the common stock of FBL, and FBPCIC still owns 39.5% of the common stock of FBL.  However, IFBF owns 100% of the Series B preferred stock of FBL, resulting in IFBF owning 72% of the total voting interest stock of FBL and FBPCIC owning only 28% of the total voting interest stock of FBL.

62.    In addition to receiving the primary financial benefits and profits from FBL as a result of its position as the majority common stock shareholder and its position as sole Series B preferred stock owner, IFBF benefitted from its relationship with FBL's minority shareholder, FBPCIC, in other respects.

63.    Farm Bureau membership was a requirement in order to purchase a policy of insurance from FBPCIC.  To purchase a policy of insurance from FBPCIC, the policyholder was required to be a county or state Farm Bureau member, or a state Farm Bureau corporation, or its cooperating county Farm Bureau associations located in any state in which FBPCIC is or has been authorized to transact insurance business.  Therefore, IFBF received and retained 100% of these Farm Bureau membership fees it received from FBPCIC's policyholders as a condition of the purchase of the policy.

64.    Moreover, IFBF benefitted from its relationship with FBL's minority shareholder, FBPCIC, because it required FBPCIC to pay royalty payments for its use of "Farm Bureau" and "FB" designations in Iowa.

65.    While the financial losses and detriment of the allowance of the fraudulent claims and activities were borne 100% by the owners of FBPCIC, the benefits flowing from the allowance of the fraudulent claims and other illegal activities and the suppression of the required reporting of those fraudulent claims and other illegal activities to the appropriate insurance regulatory authorities flowed disproportionately to IFBF through its majority ownership in FBL through commissions on the fraudulent policies issued and management fees, additional income from membership fees, the failure to properly and appropriately assess and allocate the responsibility for these fraudulent claims and other illegal activities to FBL, and the general collateral benefits accruing to IFBF as the head of the entire Farm Bureau organization.

66.    Similarly, with respect to life insurance, the benefits flowing from the allowance of the fraudulent claims and other illegal activities and the suppression of the required reporting of those fraudulent claims and other illegal activities to the appropriate insurance regulatory authorities flowed disproportionately to IFBF through FBL's management fees, the additional

income from membership fees, and the general collateral benefits accruing to IFBF as the head of the entire Farm Bureau organization.

67.     Attached hereto as Exhibit 1 and incorporated herein is Schedule Y of the Annual Statement for the year 2024 of the Farm Bureau Property & Casualty Insurance Company ("FBPCIC") showing its Organizational Chart.

**Newton and Meskimen's Employment with FBL**

68.     Newton began his employment with FBL in 2010, being hired as a Special Investigator.

69.     Newton, who formerly had been a police officer, had left law enforcement for a job in the insurance field, ultimately landing in "special investigations".

70.     Newton had been in law enforcement for a combined total of 10 years prior to his entry into the insurance field.

71.     Newton had held positions with Farmers Insurance Group, Progressive, and Nationwide and Allied insurance companies, prior to being asked to join FBL.

72.     FBL initially hired Newton away from Nationwide and Allied to serve as a Special Investigator.

73.     Subsequently, and throughout his employment with FBL, Newton was promoted and served as Team Lead, then Special Investigations Unit ("SIU") Manager, then SIU Internal Manager, and then ultimately promoted to serve in the position of Director of Investigations in 2017.

74.     In his role as Director of Investigations for FBL, Newton provided enterprise-wide oversight and direction for all internal and investigative programs.

75.     In that role, Newton was directed and entrusted to design and implement corporate policies and procedures related to ethics, internal crimes, and anti-fraud management.

76.     Newton was tasked as senior liaison with key stakeholders at FBL to ensure compliance with investigative, fraud, and ethical standards.

77.     In that role as Director of Investigations for FBL, Newton helped build the internal investigations division at FBL; crafted and delivered mandatory annual agent training to include ethics training at all New Agent hire trainings conducted at Farm Bureau Agent Academy; created the SIU Quality Assurance Guide and SIU Best Practices, which included compliance and prohibited actions; and he developed and implemented a list of "mandatory" referrals to be sent to FBL's SIU Unit/Division.

78.     Meskimen began his employment with FBL in 2014, being hired as a Special Investigator II.

79.     Meskimen, like Newton, had also formerly worked in law enforcement.

80.     Meskimen had been a police officer for 6 years prior to his entry into the insurance field.

81.     Meskimen served as a police officer with both the Cedar Falls Police Department and the Urbandale Police Department during those 6 years.

82.     Meskimen had held positions with Allied and Nationwide insurance companies, prior to being asked to join FBL.

83.     After being hired as a Special Investigator II with FBL in 2014, Meskimen was subsequently promoted to Special Investigations Unit Manager in 2017.

84.     In his role as Special Investigations Unit Manager with FBL, Meskimen was tasked with providing investigative management and developmental support to SIU.

85.     In that role, Meskimen would assist investigators with oversight of complex and large-scale internal and external investigations.

86.     Meskimen was tasked with ensuring FBL adhered to all federal and state statutes, specifically as it pertained to insurance fraud and claim investigations.

87.     Both Newton and Meskimen are highly regarded personally and professionally as men of character, honesty, and integrity.

88.     During their employment with FBL, both Newton and Meskimen were documented as high performers for FBL.

89.     Newton's annual job performance reviews were classified as "exceeding expectations" from 2010 to 2023.

90.     Meskimen's annual job performance reviews also were classified as "exceeding expectations" from 2014 to 2023.

91.     Newton was terminated by FBL on November 17, 2023.

92.     Meskimen was terminated by FBL on November 22, 2023.

**FBL's Code of Business Ethics and Conduct and Its Representations of Complying with the Law and Doing the Right Thing**

93.     FBL created and distributed to all employees a "Code of Business Ethics and Conduct – Doing What's Right (2023)" ("The Code").

94.     The opening page of The Code is a letter authored by Jennifer Morgan, Corporate Compliance Officer.

95.     In that letter, it states:

> Integrity is our organization's first guiding principle.  From the very beginning, our Companies have placed a high priority on always doing the right thing.  Customers, co-workers, governmental agencies, vendors and policy beneficiaries depend upon our Companies to maintain the highest standards of ethics and service.

We do not take lightly their trust, and value their faith and confidence.

Integrity should be the first litmus test of every decision we make. This Code of Business Ethics and Conduct is an overview of our compliance practices, and it's designed to help us make the right choices when presented with an ethical problem. We encourage you to consult this Code of Business Ethics and Conduct when you are faced with an ethical dilemma and view it as part of our ongoing commitment to doing the right thing.

96. On page 2 of The Code, FBL represents at the top of the page: "INTEGRITY –

OUR ORGANIZATION'S FIRST GUIDING PRINCIPLE". Underneath that heading, The

Code states:

Our Corporate Values consist of Integrity, Service, Leadership, Accountability, Teamwork, and Passion. These principles support our mission and brands and help us achieve our vision. Integrity is the foundation and is the backbone of our Code of Business Ethics and Conduct.

Integrity: We operate in a manner consistent with the highest professional and ethical standards.
- We are trustworthy and we trust each other
- We make decisions that support our purpose and values
- We make decisions for the right reason and communicate effectively
- We adhere to high ethical standards and report completely – including bad news
- We hold ourselves and each other accountable.

In order to "do the right thing" our Companies ask each employee to make the following compliance commitment:

The Companies will conduct business with honesty and integrity, and will make every effort to work with others who hold the same values. We will deliver what we promise, and we will treat employees, agents, customers, suppliers, and our communities with respect and fairness. We are committed to operating in compliance with all federal, state, and local laws, and in every situation, to do the right thing.

**Similar Representations Made in FBPCIC's Annual Report**

97.     As previously set out above, FBL provided and continues to provide management

services for FBPCIC.

98.     In FBPCIC's most recent Annual Report, the Annual Statement For the Year

Ended December 31, 2024 of the Condition and Affairs of the Farm Bureau Property & Casualty

Insurance Company, under General Interrogatories, Part 1 – Common Interrogatories,

Interrogatory No. 14.1 asks:

> Are the senior officers (principal executive officer, principal
> financial officer, principal accounting officer or controller, or
> persons performing similar functions) of the reporting entity subject
> to a code of ethics, which includes the following standards?
> a. Honest and ethical conduct, including the ethical handling of
>    actual or apparent conflicts of interest between personal and
>    professional relationships;
> b. Full, fair, accurate, timely and understandable disclosure in the
>    periodic reports required to be filed by the reporting entity;
> c. Compliance with applicable governmental laws, rules and
>    regulations;
> d. The prompt internal reporting of violations to an appropriate
>    person or persons identified in the code; and
> e. Accountability for adherence to the code.

In response to that Interrogatory, FBPCIC stated "Yes" by marking the "Yes" box with an "X".

**The Events Leading Up to FBL's Termination of Newton and Meskimen's Employment**

99.     On or around May 5, 2023, a residential fire occurred in Nebraska.

100.     On May 5, 2023, an insured notified FBL and/or FBPCIC of this residential fire

loss.

101.     The fire was of "unknown origin and cause" at the time of the reporting of the

claim by the insured.

102.     In the course of investigating the claim, SIU was contacted by Property Claims

Consultant Kevin McCoy ("McCoy") informing SIU that an adjuster, P.T., while at the scene of

the fire inspection, had unlawfully entered a detached garage not associated with the location of the house fire.

103.    Adjuster P.T. did this by using a credit card to pick the lock on the detached garage.

104.    Adjuster P.T. did this without the insured's permission.

105.    The detached garage purportedly contained items that the insured had indicated had been lost in the fire.

106.    Meskimen and Newton were brought into this claim by way of contact from Property Claims Consultant McCoy.

107.    McCoy apprised Meskimen and Newton of the events surrounding the illegal access to the detached garage by the adjuster assigned to the claim, Adjuster P.T.

108.    On May 8, 2023, Meskimen received a telephone call/voicemail from McCoy.

109.    This call was from McCoy in Palo, Iowa to Meskimen in North Liberty, Iowa.

110.    On May 9, 2023, Meskimen made contact with McCoy, and they reviewed Claim No. A920799P00.  During this phone call, McCoy said he did not want to place Meskimen in an awkward situation by telling him of this and said he would probably get in trouble for doing so. Meskimen said he would have to immediately notify SIU Director Newton of this, especially since Newton already had a scheduled meeting with General Counsel Wickham the next day.

111.    This call was from Meskimen in North Liberty, Iowa to McCoy in Palo, Iowa.

112.    On that same day, May 9, 2023, Meskimen contacted Newton to relate to Newton Meskimen's phone call with McCoy that date and their discussion of Claim No. A920799P00 and the issues McCoy brought to Meskimen's attention.

113.    This call was from Meskimen in North Liberty, Iowa to Newton in Beatrice, Nebraska.

114.    On that same day, May 9, 2023, Meskimen and Newton called McCoy to further discuss Claim No. A920799P00 and the issues surrounding the illegal access to the detached garage by the adjuster assigned to the claim, Adjuster P.T.

115.    This conference call was with Meskimen in North Liberty, Iowa, Newton in Beatrice, Nebraska, and McCoy in Palo, Iowa.

116.    The next day, on May 10, 2023, Newton met with General Counsel Wickham at the Farm Bureau home office in West Des Moines, Iowa.

117.    During that in-person meeting between Newton and Wickham in which they reviewed Claim No. A920799P00, Newton obtained authorization for SIU to interview by phone Adjuster P.T. and the two third-party vendors who were present at the scene of the fire inspection with Adjuster P.T. to assist in the investigation—M.S. with IFIC and L.C. with Onsite Engineering.

118.    On that same day, May 10, 2023, after Newton and Meskimen had completed the phone interviews with the two third-party vendors, Newton and Meskimen met with General Counsel Wickham and again advised him FBL and/or FBPCIC had an obligation to disclose to its insured the illegal access to the insured's detached garage.

119.    The following day, on May 11, 2023, a teleconference was held to further discuss this claim (Claim No. A920799P00) and formulate a plan for proceeding.  The participants in the teleconference were General Counsel Wickham, Assistant General Counsel Olson, Associate General Counsel Daniel Peacock (all of whom were attorneys of the WG law firm), Vice President of Property and Casualty Claims Kimmi, and Meskimen.

120.    During this teleconference, Assistant General Counsel Olson and Vice President Kimmi discussed possibly paying the claim once they had a full understanding of the total exposure.  At the very least, Olson advised they simply would not contest any property discovered in the detached garage.

121.    During this teleconference, Assistant General Counsel Olson also advised that any further vendor involvement needed to be terminated.  Olson directed SIU to contact the third-party vendors to terminate their involvement.

122.    A company conference line was used for this teleconference.  Meskimen participated by phone from North Liberty, Iowa.  Upon information and belief, most, if not all other participants were at the Farm Bureau home office in West Des Moines, Iowa at the time of this teleconference.

123.    The next day, on May 12, 2023, a second teleconference was held to further discuss the claim (Claim No. A920799P00) and to finalize the plan for proceeding.  The participants in this second teleconference were Assistant General Counsel Olson, Associate General Counsel Peacock, Vice President Kimmi, and Meskimen.

124.    During this second teleconference, Assistant General Counsel Olson said he was not aware SIU was going to go out and interview everybody on this claim.  Olson advised that he wanted to make sure only a limited number of people knew about this.

125.    Meskimen told Assistant General Counsel Olson that Special Investigator DJ Zolck (who had been assigned the SIU investigation) had already interviewed Adjuster P.T. and Adjuster P.T. had admitted to the wrongful acts.

126.    During this second teleconference, Meskimen also voiced his concern with Assistant General Counsel Olson's prior directive to terminate the third-party vendors involved

in this claim because of the amount of potential evidence the two third-party vendors had already collected, including the evidence collected from the illegal access to the insured's detached garage, as well as the fact that those third-party vendors had outstanding reports.

127.    In response, Assistant General Counsel Olson directed Meskimen to hire the vendors back but directed they not document anything in their reports that mentioned the detached garage, including statements, photographs, etc.

128.    During this second teleconference, Vice President Kimmi related that Adjuster P.T. had been terminated the night before.  Assistant General Counsel Olson said that if a bad faith claim would arise, the firing of Adjuster P.T. would allow FBL to claim it had taken immediate action in terminating the employee after the issue had made its way to the Office of General Counsel.

129.    During this second teleconference, Assistant General Counsel Olson eventually agreed to allow Meskimen and Newton to meet with the insureds and notify the insureds of the illegal entry by FBL's adjuster, but prohibited Meskimen and Newton from disclosing to the insureds that the vendors had also been in the garage—leading the insureds to the misimpression that only Adjuster P.T. had been in the garage.

130.    Assistant General Counsel Olson then directed, and Property Casualty Claims Vice President Kimmi agreed, that all documentation as to the illegal entry to the insured's detached garage, including any and all photographs, should be placed into a separate claim file that Vice President Kimmi would oversee setting up.  It was expressed during this teleconference that no one should know about this second claim file being set up other than a very limited number of people – adjusters and most others being excluded.

131.    In that teleconference, Kimmi said the reason for setting up and retaining this separate second claim file was so, in the case of a bad faith claim, FBL would still have access to the information in reference to the garage that was retained in this second claim file to use to defend any bad faith claim.

132.    A company conference line was used for this teleconference.  Meskimen participated by phone from North Liberty, Iowa.  Upon information and belief, most, if not all other participants were at the Farm Bureau home office in West Des Moines, Iowa at the time of this teleconference.

133.    That same day, May 12, 2023, Newton and Meskimen, as directed, contacted the vendors, M.S. with IFIC and L.C. with Onsite Engineering, individually.  Newton and Meskimen explained to the two vendors that they were re-hired back and were to continue their work on the investigation of the fire claim, but that Assistant General Counsel Olson and Vice President Kimmi directed that they not document anything about the detached garage and the illegal access to the detached garage in their respective reports.

134.    Newton and Meskimen communicated to each of these vendors, separately, that they (Newton and Meskimen) strongly disagreed with this directive from Assistant General Counsel Olson and Vice President Kimmi to remove from their reports any reference about the illegal access to the detached garage.

135.    Newton and Meskimen strongly disagreed with Olson and Kimmi's directive because they believed this would be making false entries into the company's insurance records and reports relating to this claim.

136. With respect to Newton and Meskimen's call to M.S. with IFIC on May 12, 2023, Newton was on the phone in Beatrice, Nebraska, Meskimen was on the phone in North Liberty, Iowa, and M.S. was on the phone in Nebraska.

137. With respect to Newton and Meskimen's call to L.C. with Onsite Engineering on May 12, 2023, Newton was on the phone in Beatrice, Nebraska, Meskimen was on the phone in North Liberty, Iowa, and L.C. was on the phone in Minnesota.

138. On May 18, 2023, Vice President Kimmi sent an email to Claims Administrative Director, Marina McMains, with Claims Manager Jill Pelster, Property Claims Consultant McCoy, Newton, Zolck, and Meskimen all carbon copied in on the email. In this email, Vice President Kimmi directed McMains to set up the "new" claim file for the documentation, photographs, etc. related to the illegal access to the detached garage, and to lock down this "new" claim file so that only those persons included on the email would have access. Vice President Kimmi, in his email, also directed McMains to suppress all print from this "new" claim file.

139. Specifically, Vice President Kimmi's email of May 18, 2023, to Claims Administrative Director McMains stated:

> Please set up a new claim file that will be locked down to all except Kevin McCoy, Jill Pelster, DJ Zolck, Brent Meskimen and Jim Newton.
>
> Suppress all print from this claim.
>
> Please assign this claim to Jill and let this group know what the claim number is.
>
> Thanks.
> Tony Kimmi
> PC Claims VP
> Farm Bureau Financial Services
> 5400 University Ave
> West Des Moines, IA 50266
> (785) 410-6110 cell

(515) 226-6334

140.    Vice President Kimmi sent this email of May 18, 2023, from Iowa to recipients in both Iowa (McMains, McCoy, and Meskimen) and Nebraska (Pelster, Newton, and Zolck).

141.    That same day, on May 18, 2023, Newton and Meskimen contacted Property Claims Consultant McCoy.  McCoy expressed great discomfort with the establishment of a second claim file and said he had never experienced this previously in his career.

142.    During this call, McCoy said he had already reviewed the main claim file (Claim No. A920799P00) to ensure nothing in the claim file referenced the detached garage, access to the attached garage, or contained any documentation or photographs as to the detached garage. This was in response to Vice President Kimmi's directive that McCoy "scrub" the main claim file.

143.    With respect to this phone conference, Newton, who was in Beatrice, Nebraska, called Meskimen in North Liberty, Iowa.  Then, Newton and Meskimen conferenced in McCoy, who was in Palo, Iowa, on the call.

144.    On June 5, 2023, Claims Administrative Director McMains sent an email from the Farm Bureau home office in West Des Moines, Iowa to Vice President Kimmi, Claims Manager Pelster, Newton, Zolck, and Meskimen confirming the second or "new" claim file had been set up with a different or separate claim number.

145.    Specifically, Claims Administrative Director McMains' email of June 5, 2023, stated:

> The claim has been created under claim number <u>A933026P00</u> and is available for use.  This claim is marked in error and sensitive which means that it will have limited functionality beyond the ability to add file notes and attachments and will only be made available to the users listed below plus myself and Leslie for processing functions.  If you have any questions on functionality or need additional users to be added, please let me know.

146.    Claims Administrative Director McMains sent this email of June 5, 2023, from

Iowa to recipients in both Iowa (Vice President Kimmi and Meskimen) and Nebraska (Pelster,

Newton, and Zolck).

147.    Vice President Kimmi responded to this email from Iowa on the same day, June 5,

2023.  Kimmi's response email was addressed to the same recipients in Iowa and Nebraska.

148.    Specifically, Vice President Kimmi's email of June 5, 2023, stated:

Thank you Marina.

Jill, DJ and Kevin- you can now upload any documentation collected after the
garage incident that should not be included in the main claim file.  This will be for
retention purposes only and once you have downloaded the documentation, should
not be considered in any future considerations of the fire claim.  Thank you all for
your work on this.

Tony Kimmi
PC Claims Vice President
Farm Bureau Financial Services
PC Claims
5400 University Ave, WDM, IA 50266
Cell: (785) 410-6110

149.    That same day, on June 5, 2023, Newton and Meskimen contacted Claims

Administrative Director McMains as follow up to her email on establishing a second claim file

(Claim No. A933026P00).

150.    During this call, McMains told Newton and Meskimen that she had not done this

before.  She also told them the reason it took the time it did for her and her team to set up was

because she and her team had to bypass internal claims and underwriting systems.  She referred

to the second claim (Claim No. A933026P00) as a "shell claim".

151.    With respect to this phone conference, Newton, who was in Beatrice, Nebraska, called Meskimen in North Liberty, Iowa.  Then, Newton and Meskimen conferenced in McMains, who was at the Farm Bureau home office in West Des Moines, Iowa.

152.    On June 9, 2023, Newton and Meskimen met with General Counsel Wickham at the Farm Bureau home office in West Des Moines, Iowa.  At this meeting, Newton and Meskimen told Wickham that they could no longer in good conscience be associated with this file.

153.    During this meeting, Newton and Meskimen explained to General Counsel Wickham, in great detail, about the setting up of this second claim file in violation of established company policy and procedure and state statutes.

154.    Newton and Meskimen told Wickham that a "shell" claim and claim file had been set up to place what Kimmi had previously called the "poisonous" information, photographs, and/or documentation from the illegal accessing of the detached garage.

155.    Newton and Meskimen also told Wickham that this second claim file or "shell" claim file had been set up using a canceled insurance policy associated with and the personal identification information of another insured out of Minnesota that had absolutely no association with this claim or the parties involved.

156.    Newton and Meskimen told Wickham that, upon the direction of Assistant General Counsel Olsen and Vice President Kimmi, FBL/FBFS had utilized a prior unrelated Minnesota insured's personal information in establishing this "shell" claim to house the information, photographs, and/or documentation from the illegal accessing of a different insured's detached garage in Nebraska.

157.    During this meeting, Newton and Meskimen strongly communicated to General Counsel Wickham, in no uncertain terms, that such conduct was unprecedented and morally and ethically wrong.

158.    Newton and Meskimen told Wickham they both wanted to be removed from any further correspondence involving this Nebraska fire claim because they believed it was wrong ethically and that it violated state statutes, claims best practices, Farm Bureau Core Values, doing what's right, and that it could very well be criminal and could potentially violate privacy rights.

159.    Newton and Meskimen told Wickham that SIU was going to terminate its involvement with this claim and that they were taking their investigator off the claim.

160.    In response, Wickham told Newton and Meskimen that they would be allowed to terminate their involvement with this claim.

161.    Wickham also said he would be speaking with FBL/FBFS leadership to make sure this never happened again.

162.    In response, Meskimen told Wickham that the directives Vice President Kimmi provided in terms of establishing this "shell" claim came straight from General Counsel Wickham's own Assistant General Counsel Olson.

163.    On June 19, 2023, Business Center Claims Manager, Jill Pelster, sent an email to Vice President Kimmi and Claims Administrative Director Marina McMains (on which Property Claims Consultant McCoy, Newton, Zolck, and Meskimen were carbon copied) stating she (Pelster) had attempted to attach to the second or "new" claim file the photos of the detached garage that had been taken by Adjuster P.T.

164.    Specifically, Pelster's email of June 19, 2023, stated:

Marina, I have tried a couple times and can't get anything to upload into this claim file.  I tried adding photos to a note (there were just 5 of them) and tried e-mailing them to the file, and neither worked.  Do you know why this might be happening?  The e-mail came back saying it was an invalid subject, but I verified the claim number was correct.  Thanks!

Jill Pelster, CPCU
Business Center Claims Manager
Farm Bureau Financial Services
Nebraska Business Unit
5400 University Ave, West Des Moines, IA 50266
Cell: 308-660-9664

165.    Pelster's email of June 19, 2023, from Nebraska was sent to recipients in both

Iowa (Kimmi, McMains, McCoy, and Meskimen) and Nebraska (Newton and Zolck).

166.    On that same date, June 19, 2023, Property Claims Consultant McCoy sent a

response email from Iowa to all the same recipients of Pelster's email, which stated:

Jill,

I was able to upload the O&C report to this misc claim.

Kevin M. McCoy
Property Claim Consultant
Farm Bureau Financial Services
PC Claims
5400 University Avenue, West Des Moines, IA 50266
Office: 319-721-1725 / Fax 515-453-3665

167.    A short while later that same day, on June 19, 2023, Pelster sent another email

from Nebraska to the same recipients, which stated:

I was able to get the photos uploaded this afternoon.

Jill Pelster, CPCU
Business Center Claims Manager
Farm Bureau Financial Services
Nebraska Business Unit
5400 University Ave, West Des Moines, IA 50266
Cell: 308-660-9664

168.    On that same day, June 19, 2023, and after the above email exchange, Newton and Meskimen contacted Property Claims Consultant McCoy and told McCoy they (Newton and Meskimen) wanted to be removed from any further email communication or other correspondence regarding this claim (including both the original claim (Claim No. A920799P00) and the second "shell" claim (Claim No. A933026P00) that FBL/FBFS had opened).

169.    Newton and Meskimen told McCoy they believed what was being done with that Nebraska fire claim was wrong ethically and that it violated state statutes, claims best practices, Farm Bureau Core Values, doing what's right, and that it could very well be criminal and could potentially violate privacy rights.

170.    With respect to this phone conference, Newton, who was in Beatrice, Nebraska, called Meskimen in North Liberty, Iowa.  Then, Newton and Meskimen conferenced in McCoy by phone, who was in Palo, Iowa.

171.    McCoy responded to Newton and Meskimen on that call by telling them that he (McCoy) had not received any further or different direction from Assistant General Counsel Olson, Vice President Kimmi, or anyone else, and that to his (McCoy's) knowledge the claims process as to the fire loss was moving forward as originally planned.

172.    Even after Newton and Meskimen had informed General Counsel Wickham of all the details surrounding the setting up of the second "shell" claim file to store all the "poisonous" information, photographs, and/or documentation of the illegal access to the detached garage of a Farm Bureau insured, nothing changed.

173.    On June 29, 2023, Vice President Kimmi called Newton and left a voicemail asking about the investigation into the Nebraska fire loss.  Newton returned Kimmi's call right

away, and Kimmi acted as if he was unaware that SIU had terminated its involvement with the claim.

174.    During that call, Kimmi said neither he nor Assistant Attorney General Kimmi had done anything wrong.

175.    After Newton explained how the handling of this Nebraska fire claim file was wrong, Kimmi ended the call abruptly by telling Newton, in a tone of voice that Newton could clearly discern was facetious, that Kimmi was glad he (Newton) had his ethics.

176.    Certain actions of an informal group or association of some managers of FBL (consisting of the individual Defendants named in this action, Defendant Swinton; Defendant Mead; Defendant Pitcher; Defendant Kimmi; Defendant Wickham; Defendant Olson; and Defendant Rieck) (herein "FBL Management Group") in connection with the May 5, 2023 Nebraska fire claim were not only unethical, they were in violation of the law.

177.    The handling of the Nebraska fire claim file was wrong because FBL's illegal entry into the insured's detached garage through its adjuster's picking a lock with a credit card was an illegal and unfair claims settlement practice that FBL Management Group (and each of the individual members of that Group) knew was wrong.

178.    FBL Management Group (and each of the individual members of that Group) also knew that they had a duty of full disclosure of that illegal and unfair claims settlement practice to the appropriate insurance regulatory authorities.

179.    FBL Management Group (and each of the individual members of that Group) had the obligation to report this known, illegal, and unfair insurance claims settlement practice to the appropriate insurance regulatory authorities so that an appropriate investigation of the illegal and unfair insurance claims settlement practice.

180.    FBL Management Group (and each of the individual members of that Group) knew of this obligation.

181.    FBL Management Group (and each of the individual members of that Group) had the obligation to report this known, illegal, and unfair insurance claims settlement practice and to maintain the claim file of the insured relating to the loss so that the illegal and unfair claims settlement practice would not be concealed so as to impair the integrity or availability of that claim file in the official investigation and review of that illegal and unfair claims settlement practice by the appropriate insurance regulatory authorities.

182.    FBL Management Group (and each of the individual members of that Group) knew of that obligation.

183.    On information and belief, FBL Management Group's creation of the second, secretive "shell" claim file concealing the evidence of the known, illegal, and unfair claims settlement practice and the termination of the employment of FBL's adjuster as a result of that illegal and unfair claims settlement practice and the placement of that second, secretive "shell" claim file under a false name (a name of a Minnesota insured completely unrelated to the Nebraska fire) was done with the intent to impair the integrity or availability of its use by the appropriate insurance regulatory authorities in its investigation and review of that illegal and unfair claims settlement practice and the termination of FBL's adjuster as a result of that illegal and unfair claims settlement practice.

184.    On information and belief, this second, secretive "shell" claim file is still maintained apart from the original claim file so that the entries and the record in the first claim file are not true, accurate, and complete because the first claim file has been "scrubbed" of the records and entries relating to the known, illegal, and unfair insurance claims settlement

practices committed by FBL's own adjuster and the termination of that adjuster as a result of that illegal and unfair insurance claims settlement practice.

185.    All of the insurer's activities relative to each respective claim were required to be included in a single claim file.

186.    All documents relative to that claim were required to be included and recorded in that claim file truthfully and accurately to permit the reconstruction of the insurer's activities relating to that claim from that claim file.

187.    Each claim file was required to be complete, and each relevant document within that claim file was required to be noted as to date received, date processed, or date mailed.

188.    FBL Management Group (and each of the individual members of that Group) knew of those obligations and requirements of insurers.

189.    The alteration of the entries and records to create, and the arrangements of the documents to maintain these two separate claim files for two separate purposes for a single claim, one of the claim files the formal claim file, and the other claim file a secretive claim file, in which some entries and records in each respective claim file were suppressed from and concealed or deleted from the other, rendered each of the claim files incomplete, inaccurate, and false as a basis to reconstruct the activities of the insurer relative to the claim for which the claim file was maintained.

190.    FBL Management Group (and each of the individual members of that Group) knew the creation of two separate claim files for the single claim of the Nebraska fire rendered each of the claim files incomplete, inaccurate, and false.

191.    On information and belief, FBL Management Group's alteration and maintenance of the two separate claim files with respect to the Nebraska fire claim were intended to impair

the availability and usefulness of that information in those claim files in any review, examination, investigation, or other official proceeding before the appropriate insurance regulatory authority.

192.    Specifically, 210 Nebraska Administrative Code, chapter 61, section 004.01, states, "…The insurer shall maintain claim data that is accessible and retrievable for examination…"  Section 004.02 mandates, "…Detailed documentation shall be contained in each claim file in order to permit reconstruction of the insurer's activities relative to each claim." Additionally, section 004.03 requires, "…Each relevant document within the claim file shall be noted as to date received, date processed or date mailed."

193.    These rules and requirements in the Nebraska Administrative Code were adopted pursuant to the authority of the Nebraska Unfair Insurance Claims Settlement Practices in Neb. Rev. Stat. §§44-1536 through 44-1544.  *See* 210 Neb. Admin. Code, ch. 61, §001.

194.    FBL Management Group's conduct in establishing a "shell" claim with a different and separate claim number to provide a landing place for all photographs, documents, and/or information related to the illegal access to its insured's detached garage through its adjuster picking a lock with a credit card—separate and apart from the original or main claim file and number—violated the rules and requirements adopted in the Nebraska Administrative Code under Nebraska's Unfair Insurance Claims Settlement Practices Act.

195.    On information and belief, FBL Management Group's conduct in connection with the May 5, 2023 Nebraska fire claim as set out above, and each act in furtherance of that conduct, also violated Iowa's Insurance Trade Practices Act, and constituted an unfair and deceptive act or insurance trade practice pursuant to Iowa Code section 507B.4(3)(e)(2) ("Knowingly making any false entry of a material fact in any book, report or statement of any

person or knowingly omitting to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person.").

196.    On information and belief, by committing an unfair and deceptive act(s) or insurance trade practice(s), as set out in the preceding paragraphs, FBL Management Group's conduct constituted the criminal offense(s) of fraudulent practices by violating Iowa Code section 714.8(10).  That Code section states:

A person who does any of the following acts is guilty of a fraudulent practice…

10.    Does any act expressly declared to be a fraudulent practice by any other section of the Code.

197.    On information and belief, FBL Management Group's conduct in connection with the May 5, 2023 Nebraska fire claim as set out above, and each act in furtherance of that conduct, also constituted the criminal offense(s) of fraudulent practices by violating Iowa Code section 714.8(4).  That Code section states:

A person who does any of the following acts is guilty of a fraudulent practice…

4.    Makes any entry in or alteration of any public records, or any records of any corporation, partnership, or other business enterprise or nonprofit enterprise, knowing the same to be false.

198.    On information and belief, this fraudulent practice offense constituted an indictable offense under the Iowa Code because the value of the property or claim involved exceeded $300.00.  *See* Iowa Code §714.13.

199.    On information and belief, FBL Management Group (and each of the individual members of FBL Management Group) knew of, knowingly approved, and agreed to the commission of this offense, either by active participation in it or by knowingly advising or encouraging the acts in some way before or when this offense was committed.

200.    As such, on information and belief, each of the members of the FBL Management Group aided and abetted the commission of this fraudulent practice offense and are responsible and liable for its commission and violation the same as the principal.

201.    On information and belief, FBL's Management Group's conduct in establishing a "shell" claim with a different and separate claim number to provide a landing place for all photographs, documents, and/or information related to the illegal access to its insured's detached garage through its adjuster picking a lock with a credit card in Nebraska—separate and apart from the original or main claim file and number—by using a canceled insurance policy associated with and the personal identification information of another insured out of Minnesota that had absolutely no association with this claim or the parties involved constituted the criminal offense(s) of identity theft by violating Iowa Code section 715A.8(2).  That Code section states:

> A person commits the offense of identity theft if the person fraudulently uses or attempts to fraudulently use identification information of another person, with the intent to obtain credit, property, services, or other benefit.

202.    On information and belief, this identity theft violation was an indictable offense. *See* Iowa Code § 715A.8(2).

203.    On information and belief, FBL Management Group (and each of the individual members of FBL Management Group) knew of, knowingly approved, and agreed to the commission of this offense, either by active participation in it or by knowingly advising or encouraging the acts in some way before or when this offense was committed.

204.    As such, on information and belief, each of the members of the FBL Management Group aided and abetted the commission of this identity theft offense and are responsible and liable for its commission and violation the same as the principal.

205.   On information and belief, FBL Management Group's conduct in connection with the May 5, 2023 Nebraska fire claim as set out above, and each act in furtherance of that conduct, also constituted obstruction of justice by violating 18 U.S.C. §§1512(b) and (c).  Those Code sections state, respectively:

(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; …

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

206.   Pursuant to 18 U.S.C. §1515(a)(1)(D), the term "official proceeding" for purposes of 18 U.S.C. §1512 means—

(D)  a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

207.    And, for purposes of 18 U.S.C. §1512, "an official proceeding need not be pending or about to be initiated at the time of the offense". 18 U.S.C. §1512(f)(1).

208.    On information and belief, FBL Management Group (and each of the individual members of FBL Management Group) knew of, knowingly approved, and agreed to the commission of this offense, either by active participation in it or by knowingly advising or encouraging the acts in some way before or when this offense was committed.

209.    As such, on information and belief, each of the members of the FBL Management Group aided and abetted the commission of this obstruction of justice offense and are responsible and liable for its commission and violation the same as the principal.

210.    On information and belief, FBL Management Group's conduct in connection with the May 5, 2023 Nebraska fire claim as set out above, and each act in furtherance of that conduct, also constituted mail and/or wire fraud in violation of 18 U.S.C. §§1341 and/or 1343.

211.    On information and belief, FBL Management Group (and each of the individual members of FBL Management Group) knew of, knowingly approved, and agreed to the commission of these offenses, either by active participation in them or by knowingly advising or encouraging the acts in some way before or when these offenses were committed.

212.    As such, on information and belief, each of the members of the FBL Management Group aided and abetted the commission of these mail and/or wire fraud offenses and are responsible and liable for their commission and violation the same as the principal.

213.    On information and belief, FBL Management Group's conduct in connection with the May 5, 2023 Nebraska fire claim as set out above, and each act in furtherance of that conduct, also constituted violations of 18 U.S.C. §1028 (Fraud and related activity in connection

with identification documents, authentication features, and information) and 18 U.S.C. §1028A (Aggravated identity theft).

214.    On information and belief, FBL Management Group (and each of the individual members of FBL Management Group) knew of, knowingly approved, and agreed to the commission of these offenses, either by active participation in it or by knowingly advising or encouraging the acts in some way before or when these offenses were committed.

215.    As such, on information and belief, each of the members of the FBL Management Group aided and abetted the commission of these federal fraudulent identification documents and information and identity theft offenses and are responsible and liable for their commission and violation the same as the principal.

216.    FBL Management Group's handling of the May 5, 2023 Nebraska fire claim was not just a few isolated wrongful and illegal acts or incidents.

217.    The insurance industry is highly regulated by state and federal governments to root out fraud in the industry for the protection of policyholders and other participants in the insurance industry.

218.    At times material hereto, the members of the FBL Management Group knew that the insurance industry was highly regulated by state and federal governments to root out fraud in the industry for the protection of policyholders and other participants in the insurance industry.

219.    This highly regulated system of state and federal regulation of the insurance industry is designed to create zero tolerance for fraud within the industry.

220.    At times material hereto, the members of the FBL Management Group knew the highly regulated system of state and federal regulation of the insurance industry is designed to create zero tolerance for fraud within the industry.

221.    One of the important mechanisms the state and federal governments utilized to achieve this overarching goal to root out fraud within the insurance industry was through mandatory reporting requirements imposed on participants within the industry to report any instances of fraud or fraudulent or other illegal activity to the appropriate government agency for review, examination, and investigation by the appropriate government agency.

222.    At times material hereto, the members of the FBL Management Group knew of these mandatory reporting requirements for the reporting of fraud and other fraudulent or illegal activity to the appropriate government agency.

223.    Prior to the May 5, 2023 Nebraska fire claim investigation and handling, Newton and Meskimen had become concerned that findings of fraud found by their SIU department investigations were not being reported by FBL's Management Group to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators in states where FBL was operating and conducting business.

224.    While SIU, through its investigation process, was concluding fraud was taking place, SIU was required by FBL Management Group (or one or more of the individual members of the Group) to first submit the finding of fraud to Paul Swinton ("Swinton"), who was a Vice President and Assistant General Counsel of Property & Casualty at FBL (as well as an attorney with WG law firm).

225.    Swinton refused to forward the significant majority of SIU's findings of fraud involving agents to the appropriate Departments of Insurance for review and investigation in the different states where the fraud was found to have occurred—despite each of the states requiring mandatory reporting in any such instances.

226. Iowa, Nebraska, Kansas, Minnesota, New Mexico, and Utah—states where many of these referrals were not being made—were and are all states requiring mandatory reporting as to findings of fraud.

227. In Iowa, Iowa Code section 507E.6 states:

An insurer which believes that a claim or application for insurance coverage is being made which is a violation of section 507E.3 shall provide, within sixty days of the receipt of such claim or application, written notification to the bureau of the claim or application on a form prescribed by the bureau, including any additional information requested by the bureau related to the claim or application or the party making the claim or application. The fraud bureau shall review each notification and determine whether further investigation is warranted. If the bureau determines that further investigation is warranted, the bureau shall conduct an independent investigation of the facts surrounding the claim or application for insurance coverage to determine the extent, if any, to which fraud occurred in the submission of the claim or application. The bureau shall report any alleged violation of law disclosed by the investigation to the appropriate licensing agency or prosecuting authority having jurisdiction with respect to such violation.

228. In Nebraska, Nebraska Revised Statute section 44-393 states:

Every insurance company, agent, solicitor, or broker, and every person or party having knowledge of violation of any of the provisions of this chapter, is required to promptly report the facts and circumstances pertaining thereto to the Department of Insurance, which report and the name of the informant may be held confidential by the department, its officers, assistants and employees, and not be made public.

229. In Kansas, Kansas Statutes section 40-2118(b) states:

An insurer that has knowledge or a good faith belief that a fraudulent insurance act is being or has been committed shall provide to the commissioner, on a form prescribed by the commissioner, any and all information and such additional information relating to such fraudulent insurance act as the commissioner may require.

230. In Minnesota, Minnesota Statutes section 60A.952, subd. 2, states:

Any insurer or insurance professional that has reasonable belief that an act of insurance fraud will be, is being, or has been committed, shall furnish and disclose all relevant information to the Bureau of Criminal Apprehension or to any authorized person and cooperate fully with any investigation conducted by the Bureau of Criminal Apprehension. Any person that has a reasonable belief that an act of insurance fraud will be, is being, or has been committed, or any person who

collects, reviews, or analyzes information concerning insurance fraud, may furnish and disclose any information in its possession concerning the act to the Bureau of Criminal Apprehension, any authorized person, or to an authorized representative of an insurer that requests the information for the purpose of detecting, prosecuting, or preventing insurance fraud.  The insurer may also release relevant information to any person authorized to receive the information under section 72A.502, subdivision 2.  If disclosure is made to an authorized person other than the Bureau of Criminal Apprehension, a copy of the disclosure must be sent to the Bureau of Criminal Apprehension

231.    In New Mexico, New Mexico Statute section 59A-16C-6(A) states:

Every insurer or licensed insurance professional that has a reasonable belief that an act of insurance fraud will be, is being or has been committed shall furnish and disclose knowledge and information about it to the superintendent and shall cooperate fully with any investigation conducted by the superintendent.  Failure to comply with this subsection shall constitute grounds for the superintendent to impose an administrative penalty pursuant to Section 59A-1-18 NMSA 1978 in addition to any applicable suspension, revocation or denial of a license or certificate of authority.

232.    In Utah, Utah Code section 31A-31-110(1)(a) states:

(1)(a)    A person shall report a fraudulent insurance act to the department if:
(i) the person has a good faith belief on the basis of a preponderance of the evidence that a fraudulent insurance act is being, will be, or has been committed by a person other than the person making the report; and
(ii) the person is:
(A) an insurer…

233.    In addition to the mandatory fraud referrals required by the state statutes discussed above, FBL was also required by state statutes to send termination notifications to the various state Insurance Commissioners when it terminated an agent and disclose the reason for termination in certain circumstances (i.e., when the termination was "for cause", including when the agent was terminated for fraudulent activity).  *See, e.g.*, Iowa Code sections 522B.14 and 522B.11, Nebraska Revised Statute sections 44-4062 and 44-4059, Kansas Statute sections 40-4913 and 40-4909, and New Mexico Statute section 59A-11-13 and 59A-11-14.

234.    As previously set out above, prior to the May 5, 2023 Nebraska fire claim investigation and handling, Newton and Meskimen had already become concerned that findings of fraud found by their SIU department investigations were not being reported by FBL Management Group to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators in states where FBL was operating and conducting business.

235.    Newton and Meskimen had advised and emphasized FBL Management Group and FBL's management/leadership team that reporting of insurance fraud uncovered and/or discovered by their SIU department must be reported to the various Departments of Insurance.

236.    Such mandatory referrals, however, were not happening.

237.    Similarly, in many instances the required notifications of termination for cause were not being provided either.

238.    Although Newton would argue his position to Swinton in favor of making the mandatory referrals and/or termination notifications to the various state Departments of Insurance, Swinton would ultimately override Newton and would not allow the referrals and/or notifications to be made.

239.    For example, on two separate occasions near the end of 2022, Newton called Swinton and advised Swinton that they needed to make mandatory referrals on agents.  On both of these calls, Swinton refused to allow Newton to make the required referrals.

240.    In the first call in October 2022, Newton advised Swinton that Iowa Farm Bureau Agent P.S. needed to be referred to the Iowa Department of Insurance Fraud Unit and that Swinton needed to send a termination for cause notification to the Iowa Department of Insurance, as P.S. had been fired.

241.    Agent P.S. had been fired because he had claimed to have completed and submitted a life insurance policy application on an insured prior to the insured's death, but during the SIU investigation and interview of Agent P.S. he admitted he never submitted the required forms/documents.

242.    As a result of SIU's investigation, FBL terminated Agent P.S.

243.    Newton, then, called Swinton advising that the facts and circumstances of this incident with Agent P.S. needed to be referred, and, since Swinton had terminated Agent P.S. for his actions involving this incident, Swinton should complete a termination for cause notification to the Iowa Insurance Division.

244.    In response, Swinton said he disagreed with Newton and that no referral would be approved.

245.    This phone call was made by Newton at his home in Beatrice, Nebraska to Swinton at the Farm Bureau home office in West Des Moines, Iowa.

246.    Then, later in November 2022, Newton made another call to Swinton and advised that Kansas Farm Bureau Agent R.C. needed to be referred to the Kansas Department of Insurance Fraud Unit.

247.    During SIU's investigation into Agent R.C., a Farm Bureau Sales Associate, D.R., had disclosed that Agent R.C. was forging documents with clients' signatures. And, during SIU's interview of Agent R.C., Agent R.C. admitted to having signed clients' signatures to various Farm Bureau forms, applications, and documents for years. Agent R.C. admitted having signed at least nine hundred (900) Farm Bureau forms for his clients, allegedly with the clients' consent. And, Agent R.C. admitted having signed at least one hundred (100) Farm Bureau forms without the clients' consent.

248.    As a result of SIU's investigation, FBL terminated Agent R.C.

249.    Newton, then, called Swinton advising that the facts and circumstances of this incident with Agent R.C. needed to be referred to the Kansas Department of Insurance Fraud Unit.

250.    In response, Swinton said he disagreed with Newton and that no referral would be approved.

251.    This phone call was made by Newton at his home in Beatrice, Nebraska to Swinton at the Farm Bureau home office in West Des Moines, Iowa.

252.    As a result of these two instances, Newton sent his end of year report for 2022 to General Counsel Wickham, and included in that report both of these two instances in which Assistant General Counsel Swinton refused to allow SIU to make referrals to the appropriate insurance regulatory authorities.

253.    Specifically, in that year-end report, Newton stated:

I am concerned that incidents of noncompliance and fraud are not being reported to our Internal Unit for investigation. I am also concerned that we are not being allowed to adhere to state statute Mandatory Reporting mandates.
Here are two examples:
Case Number Agent name Allegation
2022-15 [P.S.] Falsified form/Information
2022-17 [R.C.] Falsified form/Information

254.    When General Counsel Wickham saw Newton's write up on Agents P.S. and R.C. in the end of year report, Wickham was furious at Newton.

255.    On January 26, 2023, Wickham, who was at the Farm Bureau home office in West Des Moines, called Newton in Beatrice, Nebraska. During this phone call, General Counsel Wickham directed Newton to never put anything in writing like that again.

256.    Newton and Meskimen were often and continually directed <u>not</u> to make mandatory referrals to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators in states where FBL was operating and conducting business, including Kansas, Iowa, Nebraska, Utah, Arizona, and New Mexico by members of the FBL Management Group.  Just some of these instances are detailed in the following paragraphs below.

257.    In April or May 2023, in Kansas, Agent D.N. admitted during SIU's investigation that he had forged the signatures of approximately 50 of his clients/insureds over the last 3 to 4 years without their permission.  Agent D.N. admitted he would "eye" his clients/insureds' "true signature" and then emulate that signature on various insurance forms.

258.    During this investigation, Agent D.N. admitted to SIU that he provided/submitted these insurance forms knowing they contained false and misleading information in support of an insurance policy application.

259.    Nevertheless, FBL Management Group (or one or more of the individual members of the Group) refused to allow Newton and/or Meskimen to submit this admitted fraudulent conduct to the Kansas Department of Insurance—despite a directive under Kansas Revised Statutes section 40-2118(b) that they "shall" do so.

260.    In Kansas, Agent D.W. was terminated for contract manipulation.  M.M., the District Manager of Farm Bureau Financial Services in Overland Park, Kansas sent an email in December 2022 advising that Agent D.W. was terminated for contract manipulation because D.W. was writing life insurance on himself and his wife and cancelling it after a few years and then writing new policies on themselves to make more commissions.

261.    Shortly after learning of this in December 2022, Newton, who was in Beatrice, Nebraska at the time, called Swinton at the Farm Bureau home office and asked if SIU could send a referral to the Kansas Department of Insurance Fraud Unit.  Swinton replied no.

262.    Despite a directive under Kansas Revised Statutes section 40-2118(b) that they "shall" do so, Swinton (and/or other members of the FBL Management Group) refused to allow Newton and/or Meskimen to submit this admitted fraudulent conduct to the Kansas Department of Insurance.

263.    In approximately September 2019, in Kansas, FBL's Sales and Marketing investigated Agent K.B., after receiving concerns from insureds that Agent K.B. had started accounts on their (the insureds') behalf without their knowledge or consent.

264.    During that investigation of Agent K.B., Vice President Kimmi and Farm Bureau Agency Manager LeRoy Kreutzer spoke with Agent K.B. by phone and, in one particular instance, requested that Agent K.B. produce the document bearing the client's/insured's signature as there was nothing imaged in the system.

265.    Several hours later, Agent K.B. scanned and sent a document to Kimmi that contained both her (K.B.'s) signature and the client's/insured's signature with a handwritten date.

266.    The client/insured was subsequently shown the document allegedly showing her signature.  The client/insured said she did not personally meet with Agent K.B. in person to sign the document on the date claimed in the document.

267.    Shortly after learning of this in October 2019, Newton, who was in Beatrice, Nebraska at the time, called Swinton at the Farm Bureau home office and advised that this case involving Agent K.B. writing policies on people without their knowledge should have been sent

to SIU for an investigation because there could be other unknown victims.  Newton also advised

Swinton, during this phone call, that this situation should be referred to the Kansas Department

of Insurance Fraud Unit and a termination for cause notice should be sent to the Regulatory

Department of the Kansas Department of Insurance because Agent K.B. was fired.  Swinton

disagreed saying Agent K.B. was no longer with the company and directed Newton not to send a

referral and no SIU investigation was to be opened.

268.    Despite a directive under Kansas Revised Statutes section 40-2118(b) that they

"shall" do so, Swinton (and/or other members of the FBL Management Group) refused to allow

Newton and/or Meskimen to submit this admitted fraudulent conduct to the Kansas Department

of Insurance.

269.    In 2023, in Utah/Arizona, Agent D.S. was fired for filing a fraudulent claim on his

own home in Utah.  However, prior to that fraudulent conduct, Agent D.S. had written an auto

policy on a client/insured that used to live in Utah but had moved to Arizona.

270.    SIU conducted an investigation into the incident involving the client/insured and

concluded that Agent D.S. had committed forgery in the attempted manipulation of DocuSign as

to the client/insured.  SIU's investigation revealed the client/insured had no knowledge that

Agent D.S. had forged her signature via the DocuSign process.

271.    Swinton (and/or other members of the FBL Management Group) refused to allow

Newton and/or Meskimen to submit this admitted fraudulent conduct to the Utah Department of

Insurance—despite a directive/mandate under Utah Code section 31A-31-110 that they "shall"

do so.

272.    In 2018, in Iowa, during a property claims investigation, SIU determined that

Agent J.D. had added coverage after a loss.  Agent J.D. had added a 1991 Ford Mustang to the

policy for an insured, D.D., who was also his father and who, himself, was a retired Farm Bureau Agent. The 1991 Mustang was involved in a fire loss, which was a total loss to the vehicle.

273.    During SIU's investigation, Agent J.D., himself, admitted he had added the 1991 Mustang back onto the policy after the loss had occurred.

274.    The end of June 2018, Newton, who was at his home in Crete, Nebraska, called Swinton at Farm Bureau home office in West Des Moines, Iowa, because Swinton had directed the Internal Investigator assigned to the case not to refer this incident to the Iowa Department of Insurance Fraud Unit.

275.    During this call, Newton stressed to Swinton that this case had to be referred because of the overwhelming evidence of fraud.

276.    Swinton responded by advising that Agent J.D. would not be disciplined and directing that SIU was not to refer this matter because this Agent was the son of the insured and the insured was a retired Farm Bureau Agent himself.

277.    During that call, Swinton told Newton that this claim would be paid out of Farm Bureau's "slush" fund via an Error and Omissions claim.

278.    Swinton (and/or other members of the FBL Management Group) refused to allow Newton and/or Meskimen to submit this admitted fraudulent conduct to the Iowa Department of Insurance—despite a directive/mandate under Iowa Code section 507E.6 that they "shall" do so.

279.    Even as far back as 2011, in Nebraska, an SIU investigation revealed that Sales Agent G.K. intentionally attempted to back date coverage for a skid loader after the insured reported the skid loader had caught fire and burned and that Agent G.K. had made inconsistent statements to Farm Bureau representatives when questioned about coverage for the skid loader.

280.    As part of that investigation, Agent G.K. admitted to fraud.

281.    Yet, Agent G.K. was allowed to take early retirement and Swinton directed that no referral of this matter be made to the Nebraska regulatory authorities.

282.    Swinton (and/or other members of the FBL Management Group) refused to allow SIU to submit this admitted fraudulent conduct to the Nebraska Department of Insurance—despite being "required" to report it under Nebraska Revised Statute section 44-393.

283.    Again, these are just a few examples of instances in which Newton and/or Meskimen (SIU) were directed <u>not</u> to make mandatory referrals to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators by one or more members of the FBL Management Group.  There are many more.

284.    On information and belief, during the entire period when Newton and Meskimen were getting orders not to make the mandatory referrals and reports, members of the FBL Management Group were accepting direction from Mead and Pitcher not to file those mandatory referrals and reports.

285.    On information and belief, the allowance of these fraudulent claims and the suppression of the evidence of these fraudulent claims and evidence of the allowance of these fraudulent claims involved, and necessarily involved, false entries in the records, reports (financial and otherwise), and documentation in the insurance files and records of FBPCIC and/or FBL/FBFS.

286.    On information and belief, each of these instances of the allowance of fraudulent claims and the suppression of the evidence of these fraudulent claims and evidence of the allowance of these fraudulent claims in the records of FBPCIC and/or FBL/FBFS constituted a violation of Iowa's Insurance Trade Practices Act; constituted an unfair and deceptive act or

insurance trade practice pursuant to Iowa Code section 507B.4(3)(e)(2); and constituted the offense of fraudulent practice pursuant to Iowa Code section 714.8(10) and 714.8(4).

287.    On information and belief, each of these fraudulent practice offenses constituted indictable offenses under the Iowa Code because the value of the property or claim involved exceeded $300.00.  *See* Iowa Code §714.13.

288.    On information and belief, FBL Management Group (and each of the individual members of FBL Management Group) knew of, knowingly approved, and agreed to the commission of these offenses, either by active participation in them or by knowingly advising or encouraging the acts in some way before or when these offenses were committed.

289.    As such, on information and belief, each of the members of the FBL Management Group aided and abetted the commission of these fraudulent practice offenses and are responsible and liable for their commission and violation the same as the principal.

290.    On information and belief, the conduct in connection with the allowance of these fraudulent claims and the suppression of the evidence of these fraudulent claims and evidence of the allowance of these fraudulent claims, as set out above, also constituted obstruction of justice by violating 18 U.S.C. §§1512(b) and (c).

291.    On information and belief, FBL Management Group (and each of the individual members of FBL Management Group) knew of, knowingly approved, and agreed to the commission of these offenses, either by active participation in them or by knowingly advising or encouraging the acts in some way before or when these offenses were committed.

292.    As such, on information and belief, each of the members of the FBL Management Group aided and abetted the commission of these obstruction of justice offenses and are responsible and liable for their commission and violation the same as the principal.

293.    On information and belief, the conduct in connection with the allowance of these fraudulent claims and the suppression of the evidence of these fraudulent claims and evidence of the allowance of these fraudulent claims, as set out above, also constituted mail and/or wire fraud in violation of 18 U.S.C. §§1341 and/or 1343.

294.    On information and belief, FBL Management Group (and each of the individual members of FBL Management Group) knew of, knowingly approved, and agreed to the commission of these offenses, either by active participation in them or by knowingly advising or encouraging the acts in some way before or when these offenses were committed.

295.    As such, on information and belief, each of the members of the FBL Management Group aided and abetted the commission of these mail and/or wire fraud offenses and are responsible and liable for their commission and violation the same as the principal.

296.    It was FBL Management Group's handling of the May 5, 2023 Nebraska fire claim, that was the tipping point for Newton and Meskimen—the straw that broke the camel's back.

297.    While Newton and Meskimen had previously been concerned that findings of fraud found by their SIU department investigations were not being reported by FBL Management Group to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators, it was the egregiousness of FBL Management Group's conduct with respect to the Nebraska fire claim and the setting up of the secretive "shell" claim to hide "poisonous" evidence that caused Newton and Meskimen to decide they could no longer look the other way and defer to Swinton and FBL Management Group's refusal to make mandatory referrals of fraudulent activity to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators.

298.    Newton and Meskimen felt they could no longer just voice their objections but were required by law to make the mandatory referrals of fraudulent activity to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators.

299.    Accordingly, on August 30, 2023, Newton had an in-person meeting with General Counsel Wickham and told Wickham he was unhappy with Swinton and the way he operates by not following policies and procedures, Farm Bureau's own best practices, core values, doing what's right, and, most importantly, what is required under the mandatory referral state statutes.

300.    During this meeting, Newton advised General Counsel Wickham that the Nebraska fire claim and the "shell" claim needed to be referred to the Nebraska Department of Insurance.

301.    General Counsel Wickham responded by telling Newton that if he made that referral his career would be over.

302.    Instead of addressing Swinton's conduct in refusing to make the mandatory referrals of fraudulent activity to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators, Swinton was promoted and Wickham decided to have Newton report directly to Swinton.

303.    On November 6, 2023, Wickham resent his email of November 2, 2023 (that Newton had not received).  That email stated:

Jim,

As you know, Karl Olson is retiring later this month and Paul Swinton has been promoted and will be assuming Karl's duties with respect to the companies' litigated claims.  Paul will also continue his current responsibilities with respect to agent and employee investigations.

Given this change in structure, I would like you to begin reporting to Paul.  This change will better align SIU with the attorney that oversees legal matters relating to claims and internal investigations on a daily basis.  I've talked to Paul about this

change as well, and he welcomes the opportunity to coordinate your work together more closely.

We can use our scheduled meeting next week to discuss the transition, or if you prefer, you and Paul are welcome to schedule a separate time to discuss.

Thanks Jim – just let me know if you would like to keep our meeting on the calendar for next week.

Mark Wickham
General Counsel
Farm Bureau Financial Services
5400 University Avenue | West Des Moines, IA 50266
(515) 226-6590 | MWickham@ifbf.org

304.    On November 9, 2023, Newton and Meskimen met in person with Karen Rieck, the Vice President of Human Resources of FBL/FBFS, to voice their concerns with respect to Swinton's and FBL Management Group's refusal to make mandatory referrals of fraudulent activity to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators.

305.    On November 17, 2023, Newton received a phone call from General Counsel Wickham and Vice President Rieck, in which Wickham said he had talked with Vice President Rieck and she said Newton had refused to report to Swinton and that, by doing so, Newton essentially resigned the position.  Wickham said he was terminating Newton because Newton refused to report to Swinton and that was part of the position now because Swinton is now in charge of SIU.

306.    In response, Newton told Rieck that he did not refuse to report to Swinton.

307.    Rieck did not deny that.  Instead, she replied by stating that the question is will you (Newton) report to Swinton?

308.    Newton replied saying yes he would.

309.    Rieck then asked if Newton would refrain from making referrals that are not authorized by Swinton.

310.    Newton replied stating so that's the question.

311.    Rieck said that's the question.

312.    Ultimately, Vice President Rieck made it clear to Newton that, even if SIU determined fraud had occurred, Swinton would make the determination as to whether a mandatory referral would be made to the appropriate Departments of Insurance for review and investigation by the appropriate insurance regulators.

313.    While Newton indicated he would not have any problem reporting to Swinton, he told Rieck that, in the event Swinton was not going to make the mandatory referrals for the discovery and/or findings of fraud, he (Newton) would have to do what the law required and make the referral.

314.    As a result, Newton was fired by FBL on November 17, 2023, due to his position on the reporting of mandatory referrals as required by law.

315.    Once Newton was fired, FBL Management Group (or one or more individual members of that Group) directed their attention to Meskimen—indicating that he (Meskimen) would replace Newton, but only if he would agree not to make mandatory referrals of fraudulent activity to the appropriate Departments of Insurance if Swinton and FBL Management Group decided they would not do so.

316.    Meskimen advised FBL Management Group (or one or more members of that Group) that he would have to follow the law and make such mandatory referrals as required by law if Swinton and FBL Management Group did not do so.

317.    Meskimen was then fired only five days later, on November 22, 2023, due to his position on the reporting of mandatory referrals as required by law.

318.    Just months before his termination, Newton received a performance appraisal that rated him as exceeding expectations in every category.  The evaluation described Newton as "one of the most well-respected employees in the organization" and praised his integrity and professionalism.

319.    At no time prior to his termination did Newton receive any discipline, negative evaluations, or formal warnings of any kind.

320.    Meskimen received consistent performance evaluations rating him as exceeding expectations across all key competencies, including integrity, communication, leadership, and accountability.

321.    As recently as the very year of his termination, 2023, Meskimen's supervisor described him as a trusted leader whose "integrity is beyond reproach" and whose work was "second to none".

322.    At no point during his tenure with FBL did Meskimen receive any formal or informal discipline, negative performance evaluations, or counseling.

### Mail Fraud & Wire Fraud

323.    Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and Wickham & Gaedelmann, P.L.L.C. ("WG") engaged in a scheme to defraud insurance policyholders, insurance and other governmental regulatory authorities, and other participants in the insurance industry who are complying with their mandatory duty of reporting fraud and other fraudulent or other illegal acts.  These Defendants perpetuated this scheme to defraud through the allowance of fraudulent claims and/or other fraudulent or illegal activities, the suppression and/or concealment

of the evidence of fraudulent claims and/or other fraudulent or illegal activities, and the

suppression and/or concealment of evidence of their allowance of the fraudulent claims and/or

other fraudulent or illegal activities.  The Defendants perpetuated this scheme to defraud, in part,

by thwarting the insurance regulatory system of the various states designed to protect insurance

policyholders and other participants in the insurance industry.  The purpose of this scheme to

defraud was to pass on the bulk of the financial costs of some fraudulent claims and/or other

fraudulent or illegal activities to the insurance policyholders and to other competitors in the

insurance industry who were complying with their mandatory reporting duties.  As a part of these

Defendants' scheme to defraud, these Defendants performed an informal internal calculus of

whether they would gain more money or property through the fraudulent scheme enuring to the

benefit of other entities and individuals, including themselves, to which the Defendants were

particularly beholden.  In furtherance of that scheme to defraud, these Defendants knowingly

devised or knowingly participated in this scheme or artifice to defraud insurance policyholders

and other competitors in the insurance industry who were complying with their mandatory

reporting duties.  Through the scheme to defraud, including their own intentional and deliberate

failure to comply with their own mandatory duties of reporting fraud and/or other fraudulent or

illegal activities, these Defendants obtained the financial benefit of the money or property of

insurance policyholders through maintaining and/or increasing sales of policies with resulting

premium dollars and membership fees or dues all while passing on the cost of these fraudulent

claims to the policyholders and other competitors in the insurance industry who were complying

with their mandatory reporting duties.  Through the scheme to defraud, these Defendants were

able to retain the money or property they perceived to directly financially benefit the entities to

which they were beholden and to enrich themselves (e.g., through continued management fees,

salaries, and/or bonuses) by means of the false or fraudulent claims allowed and the related false

or fraudulent pretenses, representations, or statements in the records, reports, financial

statements, and other documents of the policyholders' insurance companies.  As a direct and

immediate financial result of this fraudulent scheme to defraud the insurance policyholders and

the competitors in the insurance industry who were complying with their mandatory reporting

duties and to thwart, obstruct, and defraud the regulatory system of justice designed to protect

the interests of the policyholders and other participants in the insurance industry who were

complying with the insurance regulatory system, the Plaintiffs suffered damages by means of the

loss of their money and property as a direct and proximate result of this scheme.

324.    Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and WG and each of

them knew or could foresee that the U.S. Postal Service and interstate wires would be used "for

the purpose of" advancing, furthering, executing, concealing, conducting, participating in or

carrying out the scheme, within the meaning of 18 U.S.C. §§1341 and 1343.

325.    Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and WG acting singly

and in concert, personally or through their agents, used the U.S. Postal Service and interstate

wires or caused the U.S. Postal Service or interstate wires to be used "for the purpose" of

advancing, furthering, executing, concealing, conducting, participating in, or carrying out this

scheme to defraud within the meaning of 18 U.S.C. §§1341 and 1343.

326.    It is not possible for Plaintiffs to plead with particularity all instances of mail and

wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars

of many such communications are within the exclusive control and within the exclusive

knowledge of these Defendants or other presently unknown individuals.  Defendants, and each of

them, routinely used the U.S. mail in connection with their insurance business and would have

used the U.S. mail by mailing letters and other correspondence in connection with the scheme to defraud.  By way of example, however, Plaintiffs have identified several specific examples as they have explained the acts of fraud above to show how the U.S. Postal Service or interstate wires were used or how these Defendants caused the U.S. Postal Service or interstate wires to be used to deliver telephone calls, emails, letters, mailing, and other uses of the mail and wire described in the above paragraphs for the purpose of advancing, furthering, executing, and concealing the scheme to defraud.

327.     On information and belief, some of the wire communications described above occurred between persons in the same state but crossed interstate borders by reason of the technology and other mechanisms used to transmit the communications.

328.     Each and every use of the U.S. Postal Service or interstate wires described above was committed by Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and WG with the specific intent to defraud for obtaining money or property by means of false or fraudulent pretenses, representations, or statements.  Swinton's, Mead's, Pitcher's, Kimmi's, Wickham's, Olson's, Rieck's, and WG's acts of mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343 constitute racketeering activity as defined by 18 U.S.C. §1961(1)(B).

329.     Plaintiffs suffered, continue to suffer, and will suffer substantial injuries by reason of Swinton's, Mead's, Pitcher's, Kimmi's, Wickham's, Olson's, Rieck's, and WG's acts of racketeering.

**CAUSES OF ACTION**

**COUNT I**

**(CIVIL RICO – 18 U.S.C. §1962(c) – SWINTON, MEAD, PITCHER, KIMMI, WICKHAM, OLSON, RIECK, AND WG)**

COME NOW Plaintiffs James ("Jim") Newton, II, and Brent Meskimen, and for Count I of their cause of action against Defendants Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and WG, state as follows:

330.    Plaintiffs replead, repeat, and reallege, as if fully set forth herein, each and every allegation in paragraphs 1 through 329, and incorporate the same herein by this reference.

331.    Although FBL Financial Group, Inc. (d/b/a FBL Financial Group and Farm Bureau Financial Services) ("FBL" or "FBFS") and Farm Bureau Property & Casualty Insurance Company (formerly d/b/a Iowa Farm Mutual Insurance Company and Farm Bureau Mutual Insurance Company) ("FBPCIC") are named Defendants in this action for purposes of Count II, they are not Defendants for purposes of this Count I.

332.    FBL/FBFS and/or FBPCIC, as legal entities, each individually and/or together constitute an "enterprise", within the meaning of 18 U.S.C. §§1961(4) and 1962(c). Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG are each a "person", within the meaning of 18 U.S.C. §§1961(3) and 1962(c), who individually conducted, participated in, engaged in, and operated and managed (directly or indirectly) the affairs of FBL/FBFS and/or FBPCIC, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of mail/wire fraud, obstruction of justice, and fraud and related activity in connection with identification documents, authentication features, and information (i.e., identity theft) as set forth in paragraphs 22-329 above.

333.    In the alternative to paragraph 330 above, Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and WG (or any subset thereof) constituted an "enterprise", within the meaning of 18 U.S.C. §§1961(4) and 1962(c), in that they were "a group of individuals associated in fact" (the "FBL Management Group").

a.    Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG shared the common purpose(s) of (among other things) defrauding insurance policyholders, insurance and other governmental regulatory authorities, and other participants in the insurance industry who are complying with their mandatory duty of reporting fraud and other fraudulent or other illegal acts in order to obtain money or property as set out above.

b.    Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG were related in that they were all agents of FBL/FBFS and/or FBPCIC;

c.    The FBL Management Group possessed sufficient longevity for the members to carry out their purpose(s) in that the FBL Management Group (or some subset of that Group) has existed for over ten years and continues currently.

Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG are each a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962(c), who conducted, participated in, engaged in, and operated and managed the affairs of the FBL Management Group through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c).  This pattern of racketeering activity consisted of, but was not limited to, acts of mail/wire fraud, obstruction of justice, and fraud and related activity in connection with identification documents, authentication features, and information (i.e., identity theft) as set out in paragraphs 22-329 above.

334.    In the alternative to paragraphs 332 and 333 above, Swinton constituted an "enterprise", within the meaning of 18 U.S.C. §§1961(4) and 1962(c), in that he is an "individual".  Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG, are each a "person", within the meaning of 18 U.S.C. §§1961(3) and 1962(c), who conducted, participated in, engaged in, and operated and managed the affairs of Swinton through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c).  This pattern of racketeering activity consisted of, but was not limited to, acts of mail/wire fraud and obstruction of justice as set out in paragraphs 22-329 above.

335.    At all relevant times, the enterprises alleged in paragraphs 332-334 above were engaged in, and their activities affected, interstate commerce.

336.    All of the acts of racketeering described in paragraphs 22-329 above were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. §1962(c), in that their common purpose was to defraud insurance policyholders, insurance and other governmental regulatory authorities, and other participants in the insurance industry who are complying with their mandatory duty of reporting fraud and other fraudulent or other illegal acts in order to obtain money or property as set out above; their common result was to defraud insurance policyholders, insurance and other governmental regulatory authorities, and other participants in the insurance industry who are complying with their mandatory duty of reporting fraud and other fraudulent or other illegal acts in order to obtain money or property as set out above; Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG, through their employees, members, or agents, directly or indirectly, participated in the acts and employed the same or similar methods of commission; Plaintiffs were victims of the acts of racketeering;

and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

337.    All of the acts of racketeering described in paragraphs 22-329 above were continuous so as to form a pattern of racketeering activity in that Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG, engaged in the predicate acts over a substantial period (for over the past ten years up to the present) or in that acts of racketeering are ongoing and threaten to continue indefinitely.

338.    To the extent Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG, have suspended their acts of racketeering, they have only done so because of actions taken by Plaintiffs, including this legal action.  The ongoing nature of Defendants' pattern of racketeering is not obviated by this fortuitous interruption.

339.    As a direct and proximate result of, and by reason of, the activities of Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG, and their conduct in violation of 18 U.S.C. §1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. §1964(c).  Among other things, Plaintiffs suffered damages to their business or property in that they were terminated from their employment by reason of the Defendants' retaliatory actions as a direct result of (and as part of) Defendants' scheme and pattern of racketeering activity.  The retaliatory actions of the Defendants in terminating Plaintiffs' employment were directly related to (and included in) the predicate acts of Defendants' ongoing scheme and pattern of racketeering activity as shown above because Plaintiffs' employment was terminated as a direct result of Plaintiffs' refusal to join in and participate in Defendants' ongoing scheme and pattern of racketeering activity.  Defendants' retaliatory actions against Plaintiffs for Plaintiffs' refusal to agree to be complicit in Defendants' ongoing scheme and Plaintiffs' refusal

to agree to violate the mandatory duty of reporting fraudulent insurance claims and other fraudulent or illegal activity to the appropriate authorities as required by law is the reason their employment was terminated. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with the cost of the suit, reasonable attorneys' fees, and reasonable experts' fees.

WHEREFORE Plaintiffs James ("Jim") Newton, II, and Brent Meskimen demand judgment against Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG, jointly and severally, for the following: Treble damages pursuant to 18 U.S.C. §1964(c); Attorney fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper.

## COUNT II

## (CIVIL RICO CONSPIRACY – 18 U.S.C. §1962(d) – SWINTON, MEAD, PITCHER, KIMMI, WICKHAM, OLSON, RIECK, AND WG

COME NOW Plaintiffs James ("Jim") Newton, II, and Brent Meskimen, and for Count II of their cause of action against Defendants Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and WG, state as follows:

340.    Plaintiffs replead, repeat, and reallege, as if fully set forth herein, each and every allegation in paragraphs 1 through 339, and incorporate the same herein by this reference.

341.    As alleged in Count I, one or more of the following individuals violated 18 U.S.C. §1962(c): Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG. Any person(s) who is found to have violated 18 U.S.C. §1962(c) is hereafter referred to as the "Operator / Manager" for the remainder of this Count.

342.    Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, in the conduct of

the affairs of the enterprises (see ¶¶ 332-334) through a pattern of racketeering activity (see ¶¶ 22-329, 336-338) in violation of 18 U.S.C. §1962(d).  In particular, Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG intended to or agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. §1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

343.    Plaintiffs were injured by Swinton's, Mead's, Pitcher's, Kimmi's, Wickham's, Olson's, Rieck's, and/or WG's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among other acts) acts of mail/wire fraud, obstruction of justice, and fraud and related activity in connection with identification documents, authentication features, and information (i.e., identity theft), as set forth in paragraphs 22-329 above, committed through the enterprises alleged in Count I.

344.    As a direct and proximate result of, and by reason of, the activities of Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG and their conduct in violation of 18 U.S.C. §1962(d), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. §1964(c).  Among other things, Plaintiffs suffered damages to their business or property in that they were terminated from their employment by reason of the Defendants' retaliatory actions as a direct result of (and as part of) Defendants' scheme and pattern of racketeering activity.  The retaliatory actions of the Defendants in terminating Plaintiffs' employment were directly related to (and included in) the predicate acts of Defendants' ongoing scheme and pattern of racketeering activity as shown above because Plaintiffs' employment was terminated as a direct result of Plaintiffs' refusal to join in and participate in Defendants' ongoing scheme and pattern of racketeering activity.  Defendants' retaliatory actions against Plaintiffs for

Plaintiffs' refusal to agree to be complicit in Defendants' ongoing scheme and Plaintiffs' refusal to agree to violate the mandatory duty of reporting fraudulent insurance claims and other fraudulent or illegal activity to the appropriate authorities as required by law is the reason their employment was terminated.  Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with the cost of the suit, reasonable attorneys' fees, and reasonable experts' fees.

WHEREFORE Plaintiffs James ("Jim") Newton, II, and Brent Meskimen demand judgment against Swinton, Mead, Pitcher, Kimmi, Wickham, Olson, Rieck, and/or WG, jointly and severally, for the following:  Treble damages pursuant to 18 U.S.C. §1964(c); Attorney fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper.

## COUNT III

## (WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY)

COME NOW Plaintiffs James ("Jim") Newton, II, and Brent Meskimen, and for Count III of their cause of action against Defendants FBL Financial Group, Inc. (d/b/a FBL Financial Group and Farm Bureau Financial Services) ("FBL" or "FBFS") and Farm Bureau Property & Casualty Insurance Company (formerly d/b/a Iowa Farm Mutual Insurance Company and Farm Bureau Mutual Insurance Company) ("FBPCIC"), state as follows:

345.    Plaintiffs replead, repeat, and reallege, as if fully set forth herein, each and every allegation in paragraphs 1 through 344, and incorporate the same herein by this reference.

346.    At all times material hereto, prior to their wrongful termination, Plaintiffs were employees of FBL/FBFS or FBPCIC or both.

347.    Defendants for purposes of this Count III are FBL Financial Group, Inc. (d/b/a FBL Financial Group and Farm Bureau Financial Services) ("FBL" or "FBFS") and Farm Bureau Property & Casualty Insurance Company (formerly d/b/a Iowa Farm Mutual Insurance Company and Farm Bureau Mutual Insurance Company) ("FBPCIC").

348.    Defendants FBL/FBFS and/or FBPCIC are liable for all the acts of their attorneys, employees, officers, and agents under the doctrine of respondeat superior because (among other things): (a) FBL/FBFS and/or FBPCIC benefited from its employees' illegal conduct; (b) the conduct occurred substantially within the time and space limits authorized by employment; (c) the employees were motivated (wholly or in part) by a purpose to serve FBL/FBFS and/or FBPCIC; and (d) the conduct was of a kind that the employee(s) was hired to perform.  The actions of FBL/FBFS and/or FBPCIC's attorneys, employees, officers, and agents were otherwise within the scope of their employment.  In the alternative, FBL/FBFS and/or FBPCIC ratified or affirmed the illegal actions of its employees, which caused injury to Plaintiffs.

349.    Iowa law prohibits termination of employees for:

    a.    Refusing to participate in illegal conduct;

    b.    Reporting or objecting to illegal conduct (whistleblowing); and

    c.    Insisting upon compliance with laws that protect the public, including mandatory insurance fraud reporting laws.

350.    Under Iowa Code section 507E.6, insurers are required to report suspected insurance fraud to the Iowa Insurance Division's Fraud Bureau within sixty days of receiving a claim or application that may involve fraud.  Other states in which FBL/FBFS and FBPCIC FBL was operating and conducting business also had laws requiring the mandatory reporting of insurance fraud or suspected fraudulent or illegal activities.

351. Plaintiffs were engaged in protected activities when they refused to violate Iowa Code section 507E.6 and other states' mandatory reporting statutes, and when they objected to the creation of a fraudulent "shell" claim.

352. Plaintiffs' terminations were directly motivated by their refusal to participate in illegal concealment, their insistence on reporting fraud as required by law, and their ethical objections to the FBL Management Group's internal practices.

353. Plaintiffs were terminated for these protected activities.

354. Defendants FBL/FBFS and/or FBPCIC terminated Plaintiffs' employment in violation of the public policy of the State of Iowa.

355. Defendants FBL/FBFS and/or FBPCIC had no overriding business justification for terminating Plaintiffs.

356. As a direct and proximate result of the unlawful conduct of Defendants FBL/FBFS and/or FBPCIC, Plaintiffs have sustained damages, including:

    a. Loss of income and benefits (back pay and front pay);

    b. Emotional distress, humiliation, and mental anguish;

    c. Damage to reputation and career prospects;

    d. Punitive damages for Defendants' malicious and willful conduct; and

    e. Any other element of loss recoverable under Iowa law as the result of the above-described tortious conduct but not specifically set forth herein.

WHEREFORE Plaintiffs James ("Jim") Newton, II, and Brent Meskimen demand judgment against FBL/FBFS and/or FBPCIC in an amount that will reasonably compensate the Plaintiffs for the damages sustained by them individually, together with interest as provided by law and the costs of this action. Damages shall include damages for lost wages and benefits,

emotional distress and mental anguish, compensatory relief, court costs, with interest as provided

by law, and such other relief as the Court deems just and equitable.

## JURY DEMAND

The above-named Defendants, and each of them, are hereby notified that the Plaintiffs

herein do hereby demand trial by jury on all issues presented in this Complaint triable to a jury.

Respectfully submitted,

By:     */s/  Stuart L. Higgins*
       Stuart L. Higgins    AT0010945
       HIGGINS LAW FIRM, P.L.L.C.
       701 13th Street, Suite 1
       West Des Moines, IA 50265
       Telephone: (515) 619-9148
       Facsimile: (515) 777-1127
       E-mail: Stuart@higginslawiowa.com

       */s/  Justin K. Swaim*
       Justin K. Swaim    AT0007788
       SWAIM LAW FIRM, P.L.L.C
       701 13th Street, Suite 2
       West Des Moines, IA 50265
       Telephone: (515) 305-1412
       Facsimile:  (515) 864-0185
       E-mail: justin@swaimlawfirm.com

       *ATTORNEYS FOR PLAINTIFFS*

Original Electronically Filed via CM/ECF.

Copy to:

James Newton II
Brent Meskimen

*PLAINTIFFS*